*Filed Electronically*

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON**

| | |
|---|---|
| **CHERYL BURTON, PLAINTIFF** ) | |
| ) | |
| V. ) | |
| ) | |
| **CENTRE COLLEGE OF KENTUCKY,** ) | |
| **DEFENDANT** ) | **CASE NO. _____** |
|     SERVE:    BRIAN G. HUTZLEY ) | |
|                       600 WEST WALNUT ST. ) | |
|                       DANVILLE, KY 40422 ) | |
| ) | **JURY TRIAL DEMANDED** |
| **KAY DRAKE, DEFENDANT** ) | |
|     SERVE:    KAY DRAKE ) | |
|                       600 WEST WALNUT ST. ) | |
|                       DANVILLE, KY 40422 ) | |
| ) | |
| And ) | |
| ) | |
| **BARBARA LOMONACO, DEFENDANT** ) | |
|     SERVE:    BARBARA LOMONACO ) | |
|                       600 WEST WALNUT ST. ) | |
|                       DANVILLE, KY 40422 ) | |

**COMPLAINT FOR A CIVIL CASE**

Comes now the Plaintiff, Cheryl Burton, by and through the undersigned counsel, and for her Complaint against the Defendants, Centre College of Kentucky, Kay Drake, and Barbara LoMonaco, states as follows:

**NATURE OF THE CLAIMS**

This is an action for declaratory relief and monetary damages, to redress unlawful employment practices against Plaintiff by Defendants, including their unlawful retaliation against her, and their constructive discharge of her, in retaliation for having engaged in protective activity

in the workplace, in violation of the Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981").

## PARTIES

1) At all times pertinent hereto, the Plaintiff, Cheryl Burton (hereinafter also referred to as "Plaintiff"), was a citizen and resident of Boyle County, Kentucky residing at 154 Ridge View Road, Danville, Kentucky 40422.

2) At all times material hereto, the Defendant, Centre College of Kentucky ("Centre College"), was a non-profit corporation formed under the laws of the Commonwealth of Kentucky, with its principal office located at 600 West Walnut Street, Danville, Kentucky 40422, and its Agent for Service of Process being Brian G. Hutzley, at the same address.

3) At all times relevant hereto, the Defendant, Kay Drake ("Drake"), was a citizen and resident of Boyle County, Kentucky; and, was an agent and employee of Defendant, Centre College, in the position of Vice President of Human Resources at its principal address in Danville, Kentucky.

4) At all times relevant hereto, the Defendant, Barbara LoMonaco ("LoMonaco"), was a citizen and resident of Garrard County, Kentucky; and, was an agent and employee of Defendant, Centre College, in the position of Vice President for Student Life at its principal address in Danville, Kentucky.

## JURISDICTION AND VENUE

5) The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiff's rights under Section 1981.

6) Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

7) No administrative exhaustion or other conditions precedent are required prior to the filing of claims under 42 U.S.C. §1981.

## FACTUAL ALLEGATIONS

### "Relevant Background"

8) Plaintiff is a black woman, and a Licensed Practical Nurse ("LPN"), who began her employment with Centre College on August 28, 2017, when she was hired as an LPN in Centre's office of Student Health, at the rate of $19.81 per hour on a full-time basis. When Plaintiff's employment with Centre involuntarily ended, she was earning $29.30 per hour on a full-time basis.

9) Throughout her employment with Centre College, Plaintiff was never subjected to any disciplinary action. Plaintiff's immediate superior was Kathy Jones, RN, Director of the office of Student Health. Jones' immediate superior was Defendant LoMonaco, Vice President for Student Life. LoMonaco's immediate superior was Defendant Drake, Vice President of Human Resources.

10) From the inception of her employment with Centre College, Plaintiff became aware that black people were generally treated less favorably at Centre College than were white people. Plaintiff observed this to be true for both employees and students of the college.

11) Specifically, Plaintiff noted that, out of approximately four hundred (400) employees at Centre College, only an estimated thirty (30) were black. Plaintiff also noted that most black employees were in non-professional and lower-paying positions. Plaintiff also

became aware that blacks who applied for open positions at Centre College were often either not considered for the positions at all, or were not hired for the positions in favor of less-qualified white applicants. Plaintiff also became aware that it seemed that black employees were often fired for what were considered pretextual reasons, especially after they had made any complaints of racial discrimination.

12) Plaintiff also heard from many of the black students whom she encountered at Student Health that they perceived that they were not treated as well as their white counterparts. Students related to Plaintiff that they felt as if their complaints of discrimination were not taken seriously, not investigated, or not addressed at all. As a medical professional, Plaintiff observed the negative manner in which the experiences of many of these black students negatively affected their physical and mental health.

13) As a result of these experiences and observations, Plaintiff began vocalizing her shared belief that racism ran deep in the Centre College community and culture. She visibly and openly supported a student-led "sit-in" in 2018, when Centre students protested racial bias and injustice on campus, demanding that the college make changes to ensure that non-white students enjoyed the same protections and privileges that white students did. Ultimately, Plaintiff observed that nothing really changed as a result of the protest. College administrators promised that changes would be made, but the culture of racial injustice persisted.

14) Plaintiff's experiences and observations as a black employee of Centre College began to take a negative toll on her emotional and mental health, as she and other blacks were made to feel like second-class citizens on the predominantly white campus. For this reason, Plaintiff began exploring other employment options; and, in April of 2021, Plaintiff

accepted a nursing position elsewhere. When Plaintiff submitted her resignation, Defendant Drake reached out in order to convince Plaintiff to stay at Centre.

15) Plaintiff informed Drake of the reasons behind her decision, specifically her desire to escape the culture of racism at Centre. As college administrators had promised the student protesters in 2018, Drake pledged that changes would be made, and pleaded with Plaintiff to remain at Centre. Drake also offered Plaintiff a raise to $26 per hour to stay. After much consideration, Plaintiff elected to remain employed at Centre, primarily so that she could continue to make a positive impact on the physical and mental health of the students in her care. Despite Drake's promises of change for the better, change never came, and the racism persisted.

16) In 2022, Plaintiff began discussing with other black employees what could be done in their continued effort to address racial injustice at Centre. The group eventually decided to form Centre's first "Black Faculty & Staff Caucus," of which Plaintiff was a founding member.

## "Opening Conference"

17) On August 22, 2023, in advance of the 2023-2024 academic year, Plaintiff attended Centre's Opening Faculty & Staff Conference along with all other faculty and staff. Traditionally, this conference includes scheduled speakers, as well as opportunities for faculty and staff to make comments and/or ask questions. Defendants Drake and LoMonaco were also present at the Opening Conference.

18) During the Opening Conference, Melinda Weathers, with Centre's Office of Diversity and Inclusion ("ODI") was one of the scheduled speakers. Among other matters, Ms. Weathers discussed her professional activity of conducting "Implicit Bias Training" in the community. Implicit Bias Training is designed to help individuals become aware of

subconscious biases or prejudices they may have (including racial biases), and to teach them ways to counter these biases in order that they can act objectively so as to limit the influence of these biases.

19) In response to Ms. Weathers' presentation, and in the presence of all faculty and staff (including Defendant Drake), Plaintiff publicly asked whether Centre's Human Resources staff would be receiving Implicit Bias Training. The natural implication of Plaintiff's question was that Centre's Human Resources staff was in need of Implicit Bias Training. Plaintiff specifically asked the question based on her belief that, in fact, Centre's Human Resources staff, including Defendant Drake, was in need of such training.

20) A week later, on August 29, 2023, Defendant Drake showed up in the office of Student Health, asking where Plaintiff was. In and of itself, for Drake to show up asking for an employee was highly unusual, because she would normally summon an employee to come to her office if she needed to speak with them. This fact immediately caused Plaintiff's co-workers to wonder if she was in trouble for something. When Plaintiff was alerted to Drake's presence, Plaintiff immediately became anxious and fearful, specifically because Drake had come looking for her.

21) Once Plaintiff was located, she and Drake went into Plaintiff's office to speak. To Plaintiff, Drake appeared upset and agitated. In an angry manner, Drake asked Plaintiff, "Why did you feel the need to ask that question?" Plaintiff asked Drake what she was referring to, and Drake recounted the question Plaintiff posed to Melinda Weathers at the Opening Conference.

22) Plaintiff responded, just as she had during her conversation with Drake in 2021, that it was because of her perception that Centre "does not hire many black or brown folks," and "our

6

Black Caucus has been tracking the hires," and that "black people don't feel comfortable on campus." Drake acted as if she had no idea what Plaintiff was talking about.

23) Plaintiff then asked if she could ask Drake a question, and Drake agreed. Plaintiff asked Drake whether she had spoken with anybody else who raised a question, or made a comment, at the Opening Conference, to demand to know why they did so. Drake said she had not. Plaintiff then noted that plenty of white employees had made negative comments, or asked critical questions, at the Opening Conference; and, asked why it was suddenly a problem when a black employee asked a question. Plaintiff asked why Drake came to demand an answer from Plaintiff, but had not challenged any white employees in response to their comments or questions.

24) Drake responded by saying, "I thought we were good." Plaintiff asked how Drake thought she and Plaintiff "were good." Drake then said she wasn't aware of any race issues with hiring at Centre. Plaintiff told Drake, "Well, there are issues, and I know you all know there are issues." Drake ended the conversation by simply saying, "Well, I just wanted to follow up to see why you asked that question," and then left.

25) As soon as Drake left Plaintiff's office, Plaintiff became very anxious, began to shake, and started crying. Plaintiff understood very clearly from Drake's visit, and her comments, that Drake was angry at Plaintiff's question. Plaintiff considered Drake's confrontation with her, and the manner in which she did so, to be retaliation for Plaintiff having asked the question about Implicit Bias Training (and the implication of the question). Plaintiff immediately began to fear for her job; and, because Plaintiff is professionally licensed through the Kentucky Board of Nursing, Plaintiff also began to fear that Drake could

7

potentially take some sort of adverse action against her employment that could negatively affect her licensure.

26) As soon as Plaintiff exited her office, visibly shaken, her boss (Kathy Jones) asked her what was wrong, and what Drake had wanted. Plaintiff told Jones about the conversation with Drake. Jones said, "Cheryl, I'm so sorry," and that she had no clue that was why Drake was there. Jones also said, "Your question was valid."

27) Plaintiff was still anxious and crying when she got home after work at the end of that day, and she realized that her blood pressure was significantly elevated. Plaintiff's husband asked her what was wrong, and she related everything that had happened. In response, Plaintiff's husband warned her "not to push the issue, or you'll become a target."

28) Later that evening, Plaintiff texted Defendant LoMonaco (Vice President for Student Life, the immediate superior to Plaintiff's boss, Kathy Jones), advised her of the events with Drake, and asked with whom she should speak regarding a problem with Drake. In the message, Plaintiff advised LoMonaco that she did not feel comfortable dealing with anybody at Human Resources because her problem with was Drake, the Vice President.

29) The next day, August 30, 2023, Plaintiff phoned LoMonaco, and again related what had happened the day before with Drake. LoMonaco admitted to Plaintiff that Drake should not have come to her office and demanded to know why Plaintiff had asked that question. However, LoMonaco also said she thought Plaintiff had "no right to have asked the question" in the first place. Plaintiff responded by saying that it was a valid question, and everyone else is allowed to make critical remarks or ask critical questions. LoMonaco replied that she thought it was "unprofessional" to have asked the question.

30) Plaintiff asked LoMonaco if it "was only a problem because a black woman questioned a white women's job?" LoMonaco responded, "Cheryl, we can't hire every black person that applies here." Plaintiff replied, "Nobody is asking you to hire every black person, but at least give black and brown applicants the same interview opportunities that white people get." Plaintiff then told LoMonaco of her husband's warning, that she'll "become a target." LoMonaco did not answer immediately, but then simply said, "Well …" Plaintiff waited in silence for LoMonaco to finish her sentence, perhaps by assuring her that she had not thereby become a target, or that nothing negative would happen to her as a result of her question; but, LoMonaco said nothing else.

31) Plaintiff reasonably interpreted from LoMonaco's answer that, indeed, her husband was correct, and she would "become a target" for having asked the question (if she hadn't already). Plaintiff also reasonably interpreted from LoMonaco's statement that LoMonaco would not do anything to protect her from any further retaliation by Drake. Plaintiff suddenly did not even feel safe discussing the matter further with LoMonaco because of these reasonable interpretations. Plaintiff's fear of further retaliation was now increased.

32) Based on the angry and confrontational manner in which Drake had acted the day before, coupled with LoMonaco's reaction and lack of support, Plaintiff instantly feared that she would suffer further retaliation by Drake. Based on her experiences and observations at Centre, Plaintiff feared that she would be fired for pretextual reasons as other black employees had been. She was also specifically in fear of what might happen to her professional licensure as a result of such a termination, or any other retaliatory action that Drake might take. In that moment, and for all of those reasons, Plaintiff decided that the only way she could protect herself professionally was to resign before she could be

terminated. Although Plaintiff loved her job, and did not want to leave Centre because of her devotion to the student population, she knew that she had no alternative but to resign before she could be fired by Drake.

33) Because of this realization, Plaintiff ended the conversation with LoMonaco by saying that her response "had said it all," and "I think it's time for me to go because I have to protect myself and my nursing license."

34) After Plaintiff hung up with LoMonaco, she notified Jones of her decision to resign, and then texted LoMonaco to see if she needed a copy of her notice. LoMonaco advised that she did not need a copy. With that, Plaintiff's employment at Centre College came to an abrupt, unfortunate, and involuntary end.

## FIRST CAUSE OF ACTION
### (Retaliation in Violation of Section 1981 by all Defendants)

35) Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

36) Plaintiff had a reasonable and good faith belief that the employment practices of Centre College were racially biased against black applicants and employees, as alleged hereinabove, and were in violation of federal law. Plaintiff's question posed during the Opening Conference was meant to specifically convey her belief that the Human Resources staff at Centre College held racial biases, and that these biases affected their employment functions (hiring, firing, etc.), and to suggest that they could therefore benefit from Implicit Bias Training. Plaintiff's public question constituted protected activity under federal law interpreting the implicit anti-retaliation application of 42 U.S.C. § 1981.

37) As a direct result of Plaintiff's protected activity, Defendant Drake took materially adverse action against Plaintiff, by angrily confronting her in the office of Student Health,

10

demanding to know why Plaintiff had asked the question, as alleged hereinabove. Plaintiff's protected activity was the sole and direct cause of Drake's materially adverse action, as reflected by Drake's specific reference to the question in her confrontation of Plaintiff.

38) Defendant Drake's actions were intended by Drake to harass, humiliate, and/or intimidate Plaintiff in response to Plaintiff's protected activity. The manner in which Drake confronted Plaintiff in her department, as opposed to summoning her to the Human Resources department, was also intended by Drake to harass, humiliate, and/or intimidate Plaintiff in response to Plaintiff's protected activity.

39) Rather than taking measures to ensure that Plaintiff would not experience further retaliation, Defendant LoMonaco joined in, and/or acquiesced to, Drake's retaliation towards Plaintiff during her phone call with Plaintiff, as alleged hereinabove. By her response to Plaintiff (or lack thereof), Defendant LoMonaco clearly confirmed that Plaintiff either had already "become a target" as the result of her protected activity, or would "become a target" because of her protected activity.

40) Defendants' retaliatory actions would deter a reasonable black employee of Centre College from engaging in protected activity under § 1981.

41) As a direct, legal, and proximate result of the retaliation by Defendants Drake and LoMonaco, Plaintiff has sustained non-economic injuries, including but not limited to: emotional distress; embarrassment; humiliation; anxiety; depression; and, fear.

42) Defendant Centre College is strictly liable for the actions of Defendants Drake and LoMonaco because Drake and LoMonaco were Plaintiff's superiors, and their actions

complained of herein were taken in their official capacities as Vice President of Human Resources and Vice President for Student Life, respectively.

43) Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's right to be free from retaliation.

44) Defendants' unlawful retaliatory conduct constitutes a willful and wanton violation of 42 USC § 1981, was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

**SECOND CAUSE OF ACTION**
**(Constructive Discharge in Violation of Section 1981 by all Defendants)**

45) Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

46) Based on the actions and statements of Defendants Drake and LoMonaco, as alleged hereinabove, and motivated solely by concerns of additional retaliation, and the potential negative effects such retaliation could have on her professional licensure, Plaintiff resigned her employment at Centre College. Plaintiff's resignation was involuntary; and, but for the aforementioned acts and statements by Defendants Drake and LoMonaco, Plaintiff would have continued in her employment indefinitely.

47) Based on the actions and statements of Defendants Drake and LoMonaco, as alleged hereinabove, any reasonable black employee of Centre College, in the same situation and position that Plaintiff was in, would have felt compelled to resign. As a result, Plaintiff was constructively discharged.

48) Defendant Centre College is strictly liable for the actions of Defendants Drake and LoMonaco because Drake and LoMonaco were Plaintiff's superiors, and their actions

complained of herein were taken in their official capacities as Vice President of Human Resources and Vice President for Student Life, respectively.

49) As a direct, legal, and proximate result of her constructive discharge, Plaintiff has sustained economic and non-economic injuries, including but not limited to: lost wages; emotional distress; embarrassment; humiliation; anxiety; depression; and, fear.

### THIRD CAUSE OF ACTION
**(Punitive Damages against all Defendants)**

50) Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

51) The Defendants engaged in discrimination with malice or reckless indifference to the federally protected rights of the Plaintiff.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court provide the following relief:

A. For a trial of this case by jury;

B. For a judgment declaring that the actions, conduct and practices of Defendants complained of herein violated the laws of the United States;

C. For an award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, the loss of past and future income, wages, compensation, job security and other benefits of employment;

D. For an award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her severe mental anguish and emotional distress,

humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical or mental injuries;

E. For an award of punitive damages;

F. For an award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

G. For such other and further relief as the Court may deem just and proper.

Dated: February 11, 2025

                                      Respectfully Submitted:

                                      /s/Daniel E. Whitley, Sr.  .
                                      DANIEL E. WHITLEY, SR.
                                      (KBA #94003)
                                      WHITLEY LAW OFFICE PLLC
                                      201 East Main St., Ste. 510
                                      LEXINGTON, KY 40507
                                      Phone: (859) 309-2648
                                      daniel@whitleylawoffice.com
                                      COUNSEL FOR PLAINTIFF